**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **JUSTIN TROUARD**, *et al.* | * | |
| | * | |
| **Plaintiffs,** | * | |
| v. | | **Case No.: PWG-14-1703** |
| | * | |
| **DICKEY'S BARBECUE** | * | |
|   **RESTAURANTS, INC.,** | | |
| | * | |
| **Defendant.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| **CHORLEY ENTERPRISES INC.**, *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| v. | | **Case No.: GLR-14-1650** |
| | * | |
| **DICKEY'S BARBECUE** | * | |
|   **RESTAURANTS, INC.,** | | |
| | * | |
| **Defendant.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs Justin Trouard and Jessica Chelton (the "Trouard Plaintiffs") entered into a franchise agreement ("Franchise Agreement") with Defendant Dickey's Barbecue Restaurants, Inc. ("Dickey's") and proceeded to incur significant debt opening and running their restaurant instead of realizing the profits that they expected. Their attorney contacted Dickey's, claiming that Defendants Dickey's, Roland Dickey, Jr., and Jerrel Denton, Director of Business Development for Dickey's, violated the Maryland Franchise Registration and Disclosure Law, Md. Code Ann., Bus. Reg. § 14-201 *et seq.* ("Maryland Franchise Law"), and asking to discuss mediation. When Defendants pursued arbitration instead of mediation, the Trouard Plaintiffs

informed them that, in their view, the arbitration clause of the Franchise Agreement was unenforceable under the Maryland Franchise Law.  Plaintiffs Chorley Enterprises, Inc., Matthew Chorley and Carla Chorley (the "Chorley Plaintiffs")[1]  share a similar history, also having entered into a franchise agreement with an arbitration clause[2] with Dickey's and then lost money trying to run their restaurant.  The Chorley Plaintiffs also entered into a development agreement ("Development Agreement") with Dickey's, under which they planned to open a second restaurant; the Development Agreement contained an identical Arbitration Clause.  The Trouard Plaintiffs and the Chorley Plaintiffs each filed suit in this Court against Defendants, alleging fraud and violations of the Maryland Franchise Law, and seeking declaratory judgments and injunctive relief from the pending arbitration.  At this juncture, I must determine whether the Arbitration Clause is valid and enforceable.[3]  Because I find that the Arbitration Clause is

---

[1] References to "the Plaintiffs" include both the Trouard Plaintiffs and the Chorley Plaintiffs.

[2] Because the material terms are identical, the term "Franchise Agreement" will refer to the Chorley Plaintiffs' Franchise Agreement, as well as the Trouard Plaintiffs' Franchise Agreement, and the term "Arbitration Clause" refers to the Arbitration Clause that appears in both Franchise Agreements.

[3] In the Trouard Plaintiffs' case, PWG-14-1703 ("*Trouard*"), the Trouard Plaintiffs filed a Motion for a Preliminary Injunction and Memorandum in Support, ECF Nos. 2 & 2-1 in *Trouard*, seeking to enjoin the arbitration action from proceeding.  In the Chorley Plaintiffs' case, GLR-14-1650 ("*Chorley*"), the Chorley Plaintiffs also filed a Motion for Preliminary Injunction and Memorandum in Support, ECF Nos. 3 & 3-1 in *Chorley*, relying on the same argument and analysis.  Except where the facts or analysis differs, I will refer to the filings in the Trouard Plaintiff's case for convenience.  On the Plaintiffs' unopposed request, I consolidated the cases for purposes of resolving the pending motion only. ECF Nos. 22; *see* ECF Nos. 18 & 21. Defendants filed an Opposition and Cross-Motion to Compel Arbitration and to Stay These Actions and Memorandum in Support, ECF Nos. 23 & 23-1, with regard to both cases.  The Plaintiffs filed a Consolidated Reply and Opposition, ECF No. 30, and Defendants filed a Reply, ECF No. 31-1; *see* ECF No. 34 (construing Sur-Reply as Reply).

For the reasons stated in this Memorandum Opinion, I will deny the parties' motions without prejudice and schedule a jury trial with regard to whether the parties intended to arbitrate as opposed to litigate franchise claims arising under the Maryland Franchise Law, and whether the Franchise Agreement requires such claims to be brought in Texas or Maryland.  The rulings I make in this Memorandum Opinion and accompanying Order are limited to the parties that

ambiguous with regard to the parties' intent, and that resolution of this issue[4] involves disputed facts that must be resolved by a jury, I will deny the parties' motions without prejudice and schedule a trial on this limited issue.

## I.      BACKGROUND

Trouard approached Defendants in August 2012 about opening a Dickey's franchise. Trouard Compl. ¶¶ 10, 21, ECF No. 1.  The Trouard Plaintiffs allege that Denton, through phone conversations and a Franchise Disclosure Document ("FDD") that he sent Trouard by email, made several representations about the start-up costs that significantly underestimated the actual

---

entered into the Franchise Agreement or Development Agreement, as relevant; they do not pertain to persons who did not enter into the Franchise Agreement (or Development Agreement, as relevant) because, regardless of the validity of the Arbitration Clause, such parties did not agree to arbitrate.  *See Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 835 A.2d 656, 661 (Md. 2003) ("'[A] party cannot be required to submit any dispute to arbitration that it has not agreed to submit.'" (quoting *Curtis G. Testerman Co. v. Buck*, 667 A.2d 649, 654 (Md. 1995))).

In that regard, I note that, originally, Trouard entered into a Franchise Agreement with Dickey's, to which Chelton was not a party.  *See* Trouard Franchise Agr., Trouard Compl. Ex. E, ECF No. 1-5.  Trouard and Dickey's amended their Franchise Agreement to add Chelton as a party on April 30, 2013.  Trouard Compl. 13 n.3.  According to the Trouard Plaintiffs, "[t]his amendment was mandated by Dickey's in order to qualify Chelton as an operating manager of the restaurant."  *Id.*  They insist that, "[a]lthough bound by the agreement, Chelton contributed none of her personal funds, and is party to this lawsuit only as a necessary party under Fed.R.Civ.P. 19(a)(1)."  *Id.*  Further, Dickey signed all of the agreements, but as President of Dickey's, not individually; Matthew Chorley signed the Chorley Plaintiff's Franchise Agreement as President of Chorley Enterprises, Inc. and as a guarantor; Carla Chorley also signed as a guarantor; and Denton did not sign any of the agreements.  Trouard Franchise Agr.; Chorley Franchise Agr., Chorley Compl. Ex. C, ECF No. 1-3 in *Chorley*; Dev. Agr., Chorley Compl. Ex. D, ECF No. 1-4 in *Chorley*.  I also note that "[w]hile it is true that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit,' *AT & T Technologies*, 475 U.S. at 648, 106 S.Ct. at 1418 (internal quotation marks and citation omitted), there is no strict requirement that only signatories to an agreement be susceptible to compelled arbitration."  *Alamria v. Telcor Int'l, Inc.*, 920 F. Supp. 658, 669 (D. Md. 1996).

[4] I will order the consolidation of both cases for this limited purpose.  *See* Fed. R. Civ. P. 42(a)(1); *A/S J. Ludwig Mowinckles Rderi v. Tidewater Constr. Co.*, 559 F.2d 928, 933 (4th Cir. 1977) ("District courts have broad discretion under F. R. Civ. P. 42(a) to consolidate causes pending in the same district.").

costs, and representations about the profits that overestimated the actual profits.  *Id.* ¶¶ 10–11, 16, 22, 33, 37–39, 55, 82, 96.  Trouard received a 2011 Virginia FDD and signed a Virginia franchise agreement in August 2012, *id.* ¶ 25, but, because the Trouard Plaintiffs could not afford to open a franchise in Virginia, they ultimately selected a Germantown, Maryland location, *id.* ¶¶ 29–31.

Denton informed Trouard in October 2012 that he would have to sign a Maryland franchise agreement and rescind the Virginia agreement.  *Id.* ¶ 51.  Denton sent Trouard the 2011 Maryland FDD, which "contained similar information regarding the estimated initial investment required to open a restaurant as the 2011 VA FDD; however, the amounts were negligibly less." Compl. ¶¶ 33, 36, 51.  The Trouard Plaintiffs claim that, on December 21, 2011, the State of Maryland approved the 2012 Maryland FDD, which "made significant and material changes to the information provided in the 2011 MD FDD," specifically by increasing the estimated initial investment by up to 28%," but "Dickey's never provided Trouard with a copy of it, despite the fact that the parties had still not executed a franchise agreement for the Germantown Property by that time." ¶¶ 38, 52.  According to the Trouard Plaintiffs, Denton sent Trouard a Maryland Franchise Agreement sometime after "late December 2012," Compl. ¶ 51, and Trouard signed it on February 19, 2013.[5]  ¶ 53.  The Trouard Plaintiffs closed their restaurant in January 2014. Trouard Compl. ¶ 60.

Shortly before the restaurant closed, the Trouard Plaintiffs' attorney contacted Defendants, alleging that Defendants committed multiple violations of the Maryland Franchise Registration and Disclosure Law, Md. Code Ann., Bus. Reg. § 14-201 *et seq.* ("Maryland

---

[5] It is dated November 26, 2012, but Plaintiffs claim that Defendants backdated it.  Trouard Compl. ¶ 53.

Franchise Law") when they sold the franchise to the Trouard Plaintiffs.   ¶¶ 61–62.   Counsel discussed mediation, but then Dickey's filed a demand for arbitration, claiming breach of contract and fraud and seeking more than $620,000 in damages.    63–64.   Plaintiffs' counsel[6] informed Defense counsel that they viewed the Arbitration Clause of the Franchise Agreement as unenforceable under the Maryland Franchise Law.   65.   Defendants did not withdraw the arbitration demand, so the Trouard Plaintiffs filed the pending Complaint on May 28, 2014, seeking, *inter alia*, injunctive relief from the pending arbitration.  67.

Chorley also approached Defendants about opening a Dickey's franchise.   Chorley Compl. ¶¶ 11–12, 27, ECF No. 1 in *Chorley*.   Like the Trouard Plaintiffs, they allege that Denton made representations about the cost of opening a Dickey's restaurant that significantly underestimated the actual costs, and representations about the profits that overestimated the actual profits.   Chorley Compl. ¶¶ 13–15, 31–32, 43, 49, 51–54.   The Chorley Plaintiffs also claim that Defendants provided them with a 2011 FDD, even though a 2012 FDD, which "made significant and material changes to the information provided in the 2011 FDD," was available, and that Defendants did not inform them about the 2012 FDD. Chorley Compl. ¶¶ 22–23, 26. The Chorley Plaintiffs signed a Maryland Franchise Agreement on October 19, 2012.   Chorley Compl. ¶¶ 29, 32.

Before the Chorley Plaintiffs opened the restaurant, Denton contacted Chorley and informed him that he was going to sell another franchise near the Chorley Plaintiffs' location, unless the Chorley Plaintiffs entered into a "Development Agreement" to purchase the "territory" around their restaurant and opened a second restaurant.   Chorley Compl. ¶ 55–56.   Again, Denton made several representations about the costs involved in opening the restaurant and the

---

[6] The same attorneys represent all of the Plaintiffs.

Chorley Plaintiffs' earning potential.  Chorley Compl. ¶ 57.  The Chorley Plaintiffs signed a Development Agreement on April 30, 2013 and paid Dickey's a $15,000 development fee. Chorley Compl. ¶ 61.  The Chorley Plaintiffs incurred significant debt opening the first restaurant and, as of May 21, 2014, when they filed their complaint, they continued to incur debt trying to run it.  Chorley Compl. ¶ 53–54.  They sought legal advice before opening the second restaurant.   Chorley Compl. ¶ 65.

Their attorney contacted Defendants on March 31, 2014, alleging that Defendants committed multiple violations of the Maryland Franchise Law when they sold the franchise to the Chorley Plaintiffs and when they entered into the Development Agreement.  66.  The Chorley Plaintiffs requested mediation and were working out the details of where and when to meet, but then Dickey's filed a demand for arbitration on May 1, 2014, claiming violations of the Franchise Agreement and the Development Agreement and seeking more than $600,000 in damages.  67–69.  Plaintiffs' counsel informed Defense counsel that arbitration was "premature" and that the Arbitration Clause of the Franchise Agreement was unenforceable under the Maryland Franchise Law.  70.  Defendants did not withdraw the arbitration demand, so the Chorley Plaintiffs filed the pending Complaint in *Chorley* on May 21, 2014.  70–71.

The Plaintiffs' complaints allege fraud and violations of the Maryland Franchise Law, for which they seek monetary damages and rescission of the Franchise Agreement and, in the Chorley's case, the Development Agreement.  The complaints also include counts for injunctive relief from the pending arbitration and a declaratory judgment that the Arbitration Clause is unenforceable and that the pending arbitration is void and without any effect.  The Plaintiffs demand a jury trial on all issues triable before a jury.  Compl. 26.

Contemporaneously with their complaints, the Plaintiffs filed the pending Motion for a Preliminary Injunction, and Defendants have filed a Cross-Motion to Compel Arbitration and to Stay These Actions along with their Opposition.  I scheduled a hearing on the motions, ECF No. 19, and the parties agreed by Consent Order not to proceed further with arbitration until I ruled on the preliminary injunction motion, ECF No. 37.  Defense counsel contacted the American Arbitration Association to hold the arbitration in abeyance during the pendency of the motion for preliminary injunction.  July 8, 2014 Ltr. 1, ECF No. 32.  The parties appeared for a hearing on July 17, 2014, at the conclusion of which I stated that I would issue a written ruling.  ECF No. 38.

## II.     SCOPE OF RULING

Plaintiffs ask that the Court determine their claims for equitable relief also at this time. However, the findings necessary to grant a motion for a preliminary injunction are different from the findings necessary for a permanent injunction.  *Compare Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (stating that, to obtain a preliminary injunction, plaintiffs must establish that (1) they are "*likely to succeed* on the merits," (2) they are "*likely to suffer* irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest"), *with Ledo Pizza Sys. Inc. v. Singh*, No. WDQ-13-2365, 2014 WL 1347113, at *6 (D. Md. Apr. 3, 2014) ("To obtain a permanent injunction, the plaintiff must show: (1) that it *has suffered* an irreparable injury; (2) that *remedies available at law, such as monetary damages, are inadequate* to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."). I will only address the pending motions at this time.

### III.     DISTILLING THE ISSUE BEFORE THE COURT

#### A.  Motion to Compel Arbitration

Congress enacted the Federal Arbitration Act, 9 U.S.C. §§ 1–15 ("FAA"), "to promote the enforceability of arbitration agreements and to make arbitration a more viable option to parties weary of the ever-increasing 'costliness and delays of litigation.'" *Saturn Distribution Corp. v. Williams*, 905 F.2d 719, 722 (4th Cir. 1990) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 220 (1985) (quoting H.R. Rep. No. 96, 68th Cong., 1st Sess. 2 (1924) (quotation marks omitted))).   Since then, "[t]he Supreme Court has repeatedly recognized the value of arbitration as a means of dispute resolution."    *Id.* (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614 (1985)).

Defendants accurately summarized the law with regard to a motion to compel arbitration under the FAA:

> "[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) . . . .   "The court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'"   *Id.* (quoting *Moses* [*H. Cone Mem'l Hosp.*, 460 U.S. 1, 24 (1983)]). However, "[w]hether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, [501] (4th Cir. 2002) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).
>
> Specifically, a "litigant can compel arbitration under the FAA if he can demonstrate '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the [plaintiff] to arbitrate the dispute.'" *Adkins*, 303 F.3d at 500-01 (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)).

Defs.' Mem. 9–10.

Here, there is no question that a dispute exists between the parties: Plaintiffs filed a lawsuit, and Defendants filed for arbitration. *See Adkins*, 303 F.3d at 500–01; Compl. 1 & ¶ 65 in *Trouard*; Compl. 1 & ¶ 69 in *Chorley*; Defs.' Mem. 8.   Further, it is undisputed that the parties' transactions in the Franchise Agreement and Development Agreement relate to interstate commerce and that Plaintiffs refuse to arbitrate the disputes.  *See Adkins*, 303 F.3d at 500–01; Pls.' Reply & Opp'n  1; Defs.' Mem. 2.   Thus, the pivotal question is whether either the Franchise Agreement or the Development Agreement includes a valid arbitration provision that pertains to the dispute. *See Adkins*, 303 F.3d at 500–01.

## B.  Preliminary Injunction

The purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).  The moving party must give the nonmoving party notice sufficient to allow for a fair opportunity to oppose it. Fed. R. Civ. P. 65(a)(1).   Here, Defendants clearly had notice, as they have opposed the motions for preliminary injunction.  *See also* Pls.' Cert. of Serv., ECF No. 3 in *Trouard*; Pls.' Cert. of Serv., ECF No. 4 in *Chorley*.

To obtain a preliminary injunction, the Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest."  *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).   As a preliminary injunction is "an extraordinary remedy. . . [it] may only be awarded upon a clear showing that

the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.  The Plaintiffs must satisfy each requirement as articulated, rather than following a "balance of hardship" approach under which "each requirement [may] be conditionally redefined" in a "flexible interplay" depending on how the other requirements were met.  *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009).

To meet the first requirement, the Plaintiffs must "clearly demonstrate that [they] will *likely succeed* on the merits," rather than present a mere "grave or serious question for litigation."  *Real Truth*, 575 F.3d at 346–47 (emphasis from the original).  Only "providing sufficient factual allegations to meet the [Fed. R. Civ. P.] 12(b)(6) standard of *Twombly* and *Iqbal*" does not meet the rigorous standard required under the *Winter* and *Real Truth* decisions. *Allstate Ins. Co. v. Warns*, No. CCB-11-1846, 2012 WL 681792, at *14 (D. Md. Feb. 29, 2012). Indeed, post-*Real Truth* courts have "declined to issue a preliminary injunction when there are significant factual disputes" in breach of contract cases.  *Chattery Int'l, Inc. v. JoLida, Inc.*, No. WDQ-10-2236, 2011 WL 1230822, at *9 (D. Md. Mar. 28, 2011) (citing *Allegra Network LLC v. Reeder,* No. 1:09-CV-912, 2009 WL 3734288, at *3 (E.D. Va. Nov. 4, 2009) (holding that the parties' conflicting versions of facts key to determining whether a breach of a franchise agreement occurred prevented the plaintiff from making a clear showing of the likelihood of success on the merits)).

Here, whether the Plaintiffs are likely to succeed on the merits involves the same question at issue with regard to whether the Court should compel arbitration:  Is there a valid arbitration agreement between the parties?  If the undisputed facts show that a valid arbitration agreement exists, then the Plaintiffs have not demonstrated clearly that they are likely to succeed on the merits, while Defendants have established each element necessary for the court to compel

arbitration, such that the Court should deny the Plaintiffs' motion and grant Defendants' motion.

Conversely, if the undisputed facts establish that there is no valid arbitration agreement, then the

Court should deny Defendants' motion and consider the other showings that the Plaintiffs must

make, as they will have demonstrated clearly that they are likely to succeed on the merits.  But, if

a "significant factual dispute[]" exists regarding the validity of the arbitration agreement, then

the Court cannot grant either motion at this juncture.  *See Rose v. New Day Financial, LLC*, 816

F. Supp. 2d 245, 252 n.5 (D. Md. Sept. 9, 2011).  This is because, when "the parties dispute the

existence[7] of an arbitration agreement, the court must 'hear the parties' on the issue, and the

party alleged to have violated the arbitration agreement is entitled to a jury trial on the existence

of an agreement."  *Id.* (quoting 9 U.S.C. § 4 and noting that "[s]tandard summary judgment rules

apply"); *see also Bd. of Educ. of Charles Cnty. v. Plymouth Rubber Co.*, 569 A.2d 1288, 1296

(Md. Ct. Spec. App. 1990) (noting that when a contract is ambiguous, it is for the jury, not the

court, to interpret it).  It is the Plaintiffs who allegedly are violating the Arbitration Clause and,

as noted, the Plaintiffs demand a jury trial on all issues triable before a jury.  Compl. 26.

---

7       It is important to keep clear that the issue here is not the *scope* of an arbitration clause-whether it applies to the particular dispute. Where scope is the issue and there is any ambiguity as to whether the agreement covers the particular dispute, we have held that the issue of arbitrability is, at least initially, for the arbitrator to determine. *Gold Coast Mall v. Larmar Corp.*, 298 Md. 96, 107, 468 A.2d 91, 97 (1983). The issue here is whether, by virtue of the [Maryland Clause], the arbitration agreement that clearly [otherwise would] cover[] this dispute continues to apply. That goes to the . . . existence, rather than the scope, of an arbitration agreement.

*Rourke v. Amchem Prods., Inc.*, 863 A.2d 926, 941 (Md. 2004).

## IV.    MARYLAND CONTRACT LAW[8]

"[A]rbitration is a matter of contract." *Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 835 A.2d 656, 661 (Md. 2003).  Put another way, it "is 'a matter of consent, not coercion." *Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 385 (4th Cir. 2013).  Consequently, "a party cannot be required to submit any dispute to arbitration that it has not agreed to submit." *Cheek*, 835 A.2d at 661 (quoting *Curtis G. Testerman Co. v. Buck,* 340 Md. 569, 579, 667 A.2d 649, 654 (1995)).  Therefore, I will apply contract law to determine whether the Arbitration Clause is valid and enforceable.  *See id.*

Maryland law regarding contract formation and interpretation is well-settled.  "[T]he cardinal rule of contract interpretation is to give effect to the parties' intentions." *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (quoting *Tomran, Inc. v. Passano*, 391 Md. 1, 14, 891 A.2d 336, 344 (2006) (citing *Owens–Illinois, Inc. v. Cook*, 386 Md. 468, 497, 872 A.2d 969, 985 (2005))).  Nonetheless,

> [c]ourts in Maryland apply the law of objective contract interpretation, which provides that "[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding."

*Id.* (quoting *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 368, 137 A.2d 687, 693 (1958)).  Thus, a contract "is 'measured by its terms unless a statute, regulation, or public policy is violated thereby.'"  *Connors v. Gov't Employees Ins. Co.*, 88 A.3d 162, 166 (Md. Ct. Spec. App. 2014) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985)).

---

[8] Although the "Governing Law" provision of the Franchise Agreement states that the contract "shall be governed by and construed in accordance with the laws of the State of Texas," Franchise Agr. art. 27.5, the parties applied Maryland law in their briefs and agreed at the hearing that Maryland contract law applies.  Hr'g 2:05, July 17, 2014.

When construing an unambiguous contract, "courts focus on the four corners of the agreement[,] and ascribe to the contract's language its customary, ordinary, and accepted meaning." *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 670 (Md. Ct. Spec. App. 2012) (citations and quotation marks omitted); *see 100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 23 (Md. 2013). "As such, '[a] contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution.'" *Dumbarton*, 73 A.3d at 232 (quoting *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003)). In these circumstances, the contract's construction is "an issue of law for resolution by the trial judge." *Bd. of Educ. of Charles Cnty. v. Plymouth Rubber Co.*, 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990); *Pacific Indem. Co.*, 488 A.2d at 489.

> Put another way, the court's
>
> task … when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement, but rather, to "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *General Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985). Additionally, the principles of contract interpretation require that "in ascertaining the true meaning of a contract ... [,] the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 167, 198 A.2d 277, 283 (1964). *See also Tomran, Inc.*, 391 Md. at 13–14, 891 A.2d at 344; *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 782, 625 A.2d 1021, 1033 (1993).

*Dumbarton*, 73 A.3d at 232–33.

However, "when there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances . . . the contract [is] submitted to the trier of . . . fact for interpretation." *Bd. of Educ. of Charles Cnty.*, 569 A.2d at 1296. Nonetheless, "[t]he court may construe an ambiguous contract if there is no factual dispute in the evidence." *Pacific*

*Indem. Co.*, 488 A.2d at 489.   Contract language is ambiguous "if, to a reasonably prudent person, the language used is susceptible of more than one meaning and not when one of the parties disagrees as to the meaning of the subject language." *Id.*; *see Sierra Club v. Dominion Cove Point LNG, L.P.*, 86 A.3d 82, 89 (Md. Ct. Spec. App. 2014) ("[T]he mere fact that the parties disagree as to the meaning does not necessarily render [a contract] ambiguous.").   "An ambiguity does not exist simply because a strained or conjectural construction can be given to a word." *Dumbarton*, 73 A.3d at 233 (quoting *Belleview Constr. Co. v. Ruby Hall Cmty. Ass'n*, 582 A.2d 493, 496 (1990)).   Of import, "when interpreting an arbitration clause, as when interpreting any contract provision, the agreement must be considered as a whole." *Gold Coast Mall, Inc. v. Larmar Corp.*, 468 A.2d 91, 97 (Md. 1983); *see Dumbarton*, 73 A.3d at 232–33 ("[T]he principles of contract interpretation require that 'in ascertaining the true meaning of a contract ... [,] the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." (quoting *Sagner v. Glenangus Farms, Inc*., 198 A.2d 277, 283 (Md. 1964))).

"When a writing is ambiguous, extrinsic evidence is admissible to determine the intentions of the parties to the document." *Point's Reach*, 2013 WL 4710568, at *17; *see Sy–Lene of Wash., Inc. v. Starwood Urban Retail II*, 829 A.2d 540, 544 (2003) (stating that parol evidence showing the meaning of contract language "is only admissible after the court finds the contract to be ambiguous"); *see also Dumbarton*, 73 A.3d at 234 ("'Extrinsic evidence is only utilized when the intent of the parties and the purpose of a restrictive covenant cannot be divined from the actual language of the covenant in question, necessitating a reasonable interpretation of

the language in light of the circumstances surrounding its adoption.'") (citation omitted). "[E]xtrinsic evidence admitted must help interpret the ambiguous language and not be used to contradict other, unambiguous language." *Calomiris*, 727 A.2d at 366.

> "It is a basic principle of contract law that, in construing the language of a contract, ambiguities are resolved against the draftsman of the instrument," *Burroughs Corp. v. Chesapeake Petroleum & Supply Co., Inc.*, 282 Md. 406, 411, 384 A.2d 734, 737 (1978), or, in the case of a form contract, the proponent of the contract. *See, e.g., Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462 (4th Cir.1991). This principle is often referred to under the Latin term of *contra proferentem*, which literally means, "against the offeror, *he who puts forth*, or proffers or offers the language." Richard A. Lord, 11 *Williston on Contracts* § 32:12, at 472-75 (4th ed. 1999) (emphasis added).

*John L. Mattingly Const. Co. v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066, 1078 (Md. 2010). The rationale for this rule is that the drafter "'had the better opportunity to understand and explain his meaning.' " *Anderson Adventures, LLC v. Sam & Murphy, Inc.*, 932 A.2d 1186, 1194 (Md. Ct. Spec. App. 2007) (quoting *L & H Enters., Inc. v. Allied Bldg. Prods. Corp.*, 596 A.2d 672, 676 (Md. Ct. Spec. App. 1991) (quoting *King v. Bankerd*, 492 A.2d 608, 612 (Md. 1985))).[9]

The contractual language at issue involves waiver. Waiver is a "voluntary relinquishment of a known right." *Md. Econ. Dev. Corp. v. Montgomery Cnty.*, 64 A.3d 478, 492 (Md. 2013) (quoting *Dietz v. Dietz*, 351 Md. 683, 688, 720 A.2d 298, 301 (1998)). Waiver

---

[9] It is true that, "where an arbitration agreement exists, ambiguities as to arbitrability [must] be resolved in favor of arbitration." *Rourke v. Amchem Prods., Inc.*, 863 A.2d 926, 942 (Md. 2004). But, here, it is not clear whether the arbitration agreement exists, so this requirement is inapplicable. *See Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 386 (4th Cir. 2013) ("The presumption [in favor of arbitration], while certainly a critical component of the law governing arbitration agreements, applies only when "a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand," not when there remains a question as to whether an agreement even exists between the parties in the first place." (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, ---- U.S. ----, 130 S. Ct. 2847, 2858 (2010))).

may be found where there is "such conduct as warrants an inference of the relinquishment of such right, and [waiver] may result from an express agreement or be inferred from circumstances." *Hovnanian Land Inv. Group, LLC v. Annapolis Towne Centre at Parole, LLC*, 25 A.3d 967, 983 (Md. 2011) (quoting *Food Fair Stores, Inc. v. Blumberg*, 200 A.2d 166, 172 (Md. 1964)).  This is because "[w]aiver 'may result from implication and usage, or from any understanding between the parties which is of a character to satisfy the mind that a waiver is intended.'"  *Id.* (quoting *Canaras v. Lift Truck Servs., Inc.*, 322 A.2d 866, 879 (1974).  Notably, "'[w]aiver involves both knowledge and intention . . . .'"  *Lipitz v. Hurwitz*, 52 A.3d 94, 106 (Md. Ct. Spec. App. 2012) (quoting *Travelers Indem. Co. v. Nationwide Constr. Corp.*, 224 A.2d 285 (1966)).  Thus, "'[a]cts relied upon as constituting a waiver of the provisions of a contract must be inconsistent with an intention to insist upon enforcing such provisions.'"  *Hovnanian*, 25 A.3d at 983 (quoting *Gold Coast Mall*, 468 A.2d at 98 (citations and quotation marks omitted)). The Court "look[s] to the totality of a party's actions when determining whether waiver, or modification of the contract, has occurred."  *Id.*  Additionally, "[a] party's inaction or silence is relevant, especially when that party is silent in response to a breach."  *Id.* at 984 (citing *Jaworski v. Jaworski*, 95 A.2d 95, 99 (1953) ("He who is silent when he ought to have spoken, will not be heard to speak when he ought to be silent.")).  Also, "[a] requirement that waiver must be 'mutual' is an evidentiary hurdle, not a categorical limitation."  *Hovnanian*, 25 A.3d at 982 (noting that Maryland "caselaw shows a persistent unwillingness to give dispositive and preclusive effect to contractual limitations on future changes to that contract . . . , whether it is mutual modification, novation, waiver of remedies, or . . . a waiver of condition precedent").

## V. RELEVANT CONTRACTUAL LANGUAGE AND THE LAWS AND REGULATIONS IT REFERENCES

The Arbitration Clause of the Franchise Agreement contains the following language:

ARTICLE 27. APPLICABLE LAW, MEDIATION, ARBITRATION, COURT ACTIONS

27.1 <u>MEDIATION</u>. Subject only to Article 27.3, the parties agree to submit all disputes, controversies, claims, causes of action and/or alleged breaches or failures to perform arising out of or relating to this Agreement (and attachments) or the relationship created by this Agreement (collectively, "Disputes") to non-binding mediation prior to filing any action in court with respect to the Dispute. The mediation shall be conducted in Collin County, Texas through either an individual mediator or a mediator appointed by a mediation services organization or body, experienced in the mediation of disputes in the food service business, agreed upon by the parties and, failing such agreement, within a reasonable period of time after either party has notified the other of its desire to seek mediation of any Dispute (not to exceed fifteen (15) days), through the American Arbitration Association ("AAA") in accordance with its rules governing mediation, at the office of the AAA located nearest to Dickey's corporate headquarters in Plano, Collin County, Texas. The costs and expenses of mediation, including compensation and expenses of the mediator, shall be borne by the parties equally. If the parties are unable to resolve the Dispute within ninety (90) days after the mediator has been appointed, then either party may submit such Dispute to binding arbitration in accordance with Article 27.2 below.

27.2 <u>ARBITRATION</u>. Subject only to Article 27.1 and 27.3, all Disputes which shall not be resolved through mediation in accordance with Article 27.1 shall be submitted for binding arbitration to the office of the AAA located nearest to Dickey's corporate headquarters in Plano, Collin County, Texas, on demand of either party. Such arbitration proceedings shall be conducted in accordance with the then current commercial arbitration rules of the area. The arbitrator(s) shall have the right to award or include in their award any relief which they deem proper in the circumstances, including, without limitation, money damages (with interest on unpaid amounts from the due date), specific performance and injunctive relief. Provided, that, to the fullest extent permitted by law, the parties stipulate and agree that the arbitrators shall not provide for, and no arbitration award shall include, any punitive or exemplary damages, all of which are hereby waived by the parties. The award and decision of the arbitrator(s) shall be conclusive and binding upon all parties and adjustment may be taken on the award notwithstanding the termination or expiration of this Agreement. Dickey's and you agree that arbitration shall be conducted on an individual, not a class-wide basis.

27.3 <u>CERTAIN CLAIMS BY DICKEY'S</u>. Notwithstanding anything herein to the contrary, Dickey's may bring an action (a) for monies owed, (b) for

injunctive relief or other extraordinary relief, or (c) involving the possession or disposition of, or other relief relating to real property, in any court having jurisdiction and without first submitting such action to mediation or arbitration.

> . . .

Franchise Agr. art. 27 .  The same Arbitration Clause appears in the Chorley Plaintiffs'

Development Agreement as well, Dev. Agr. art. 14B–D; Defs.' Mem. 2.n.2

The Franchise Agreement also provides:

> ARTICLE 29. STATE-SPECIFIC PROVISIONS
> 29.1 <u>STATE SPECIFIC PROVISIONS CONTROL</u>. You acknowledge that the Laws of various states may have jurisdiction over you and may modify certain of your rights and obligations hereunder. Accordingly, you acknowledge and agree that the Laws of such states (including those, if any, set forth in Article 29.2) (collectively, "Controlling Law") shall govern and control any contrary or inconsistent provisions of this Agreement (collectively, "Inconsistent Provisions") and such Inconsistent Provisions are hereby modified and amended, where applicable, so that any Inconsistent Provisions of this Agreement comply with Controlling Law; <u>PROVIDED HOWEVER</u>, THIS AGREEMENT SHALL ONLY BE MODIFIED AND AMENDED ONLY TO THE EXTENT: (A) SUCH CONTROLLING LAW IS BINDING ON THE PARTIES TO THIS AGREEMENT; AND (B) SUCH CONTROLLING LAW IS APPLICABLE TO THE MATTERS SET FORTH IN THIS AGREEMENT. ALL OTHER TERMS AND CONDITIONS OF THIS AGREEMENT WILL REMAIN THE SAME. As used herein, (a) "Laws" means any statutes, laws, ordinances, regulations, orders, writs, injunctions, or decrees of the applicable state or Tribunal, and (b) "Tribunal" means any applicable governmental department, commission, board, bureau, agency, or instrumentality of such state.
> 29.2 <u>PROVISIONS APPLICABLE UNDER MARYLAND LAW</u>. Notwithstanding any provisions in this Agreement to the contrary, subject to Article 29 pursuant to Title 14, Sections 14-201 – 14-233 of the Annotated Code of Maryland (the "Maryland Franchise Registration and Disclosure Law") and Title 02, Subtitle 02, Chapter 8, Sections 02.02.08.01 – 02.02.08.18 of the Code of Maryland Regulations (the "Maryland Franchise Regulations"):
> * * *
> 4. The provisions of this Agreement shall not require you to waive your right to file a lawsuit alleging a cause of action arising under Maryland Franchise Law in any court of competent jurisdiction in the State of Maryland.
> * * *
> 6. Any provision of this Agreement which is otherwise prohibited under Maryland Franchise Registration and Disclosure Law or the Maryland Franchise Regulations is void.

Franchise Agr. art. 29 (the "Maryland Clause").  Notably, Paragraph 29.2(4) of the Maryland

Clause prevents the Franchise Agreement from requiring the franchisee to waive certain rights

(the "Anti-Waiver Provision").  The Chorley Plaintiffs' Development Agreement similarly

provides:

> You acknowledge that the laws of various states which may have jurisdiction over
> you may modify certain of your rights and obligations hereunder, and that
> attached hereto as Attachment D (and made a part hereof as if set forth verbatim
> herein) are various state specific modifications of this Agreement which shall
> apply only if applicable to you and your Restaurant and only if executed by you.
> Without limiting the generality of the foregoing, nothing herein shall mitigate or
> waive your rights or Dickey's liability under the Maryland Franchise Registration
> and Disclosure Law.

Dev. Agr. art. 15.D ("Acknowledgments Clause"). Attachment D, which the Acknowledgments

Clause references, states:

> Any acknowledgments or representations of the developer that disclaim
> the occurrence and/or acknowledge the non-occurrence of acts that would
> constitute a violation of the Franchise Law are not intended to nor shall they act
> as a release, estoppel or waiver of any liability incurred under the Maryland
> Franchise Registration and Disclosure law.
> Any provision of this Agreement which designates jurisdiction or venue
> outside of the State of Maryland or requires you to agree to jurisdiction or venue
> in a forum outside of the State of Maryland is void with respect to any claim
> arising under the Maryland Franchise Registration and Disclosure Law.

*Id.* Att. D ¶¶ 2, 3 ("Maryland Addendum").

The relevant Maryland Franchise Regulation, Md. Regs. 02.02.08.16(L) (the "Anti-

Waiver Regulation"), provides:

> Prohibited Releases from Liability and Waivers. A person authorizing,
> aiding in, or causing to be made, an offer or sale of a franchise commits a
> "misrepresentation to, deceit of, or fraud on the buyer" within the meaning of the
> Maryland Franchise Law, Business Regulation Article, §14-221(2), Annotated
> Code of Maryland, and engages in an "act, practice, or course of business which
> operates or would operate as a fraud or deceit on another person" within the
> meaning of the Maryland Franchise Law, Business Regulation Article, §14-
> 229(a)(3), Annotated Code of Maryland, if that person requires a franchisee to:

(1) Provide a release from liability under the provisions of the Maryland Franchise Law as part of a franchise agreement or as a condition of the sale, renewal, or assignment of a franchise.

. . .

(3) Waive the franchisee's right to file a lawsuit alleging a cause of action arising under the Maryland Franchise Law in any court of competent jurisdiction in this State.

Also relevant is Md. Code Ann., Bus. Regs. § 14-226, which provides: "As a condition of the sale of a franchise, a franchisor may not require a prospective franchisee to agree to a release, assignment, novation, waiver, or estoppel that would relieve a person from liability under this subtitle." Additionally, Bus. Regs. § 14-227(b) states that "[t]he person who buys or is granted a franchise may sue under this section to recover damages sustained by the grant of the franchise."

## VI.   DISCUSSION

### A.   Existence Or Nonexistence Of Valid Arbitration Agreement

In the Plaintiffs' view, "[t]he plain, unambiguous language of [t]he [Arbitration] Clause clearly provides a mandatory, two-step dispute resolution process: non-binding mediation, followed by binding arbitration" for "all and every type [of] dispute relating to the contract, including claims arising under the [Maryland Franchise Law]." Pls.' Mem. 9. Yet, the Plaintiffs insist that, "by the express terms of the Franchise Agreement, the arbitration [clause]'s incompatibility with the [Maryland Franchise Law] renders it void," because, "when the contract as a whole is examined," the contract "recognize[s] that certain state laws, expressly including the [Maryland Franchise Law], will control and govern [its] terms," and "the Maryland Clauses . . . apply to nullify the arbitration [clause] because of its inconsistency with the [Maryland Franchise Law]." *Id.* at 2, 8, 11. Specifically, the Plaintiffs argue that the Arbitration Clause is "in direct conflict with the provisions of COMAR 02.02.08.16(L)(3), which prohibits any waiver by the franchisee of its right to file a claim arising under the [Maryland Franchise Law] in any

court of competent jurisdiction in the State of Maryland." *Id.* at 9.  The Plaintiffs argue that, even though "the Maryland Clause states that the conflicting provisions of the agreement are to be modified so that they are compliant with the controlling state laws, there is no amendment mechanism nor is there any discrete term in the arbitration [clause] that can be severed to make it compliant with the [Maryland Franchise Law]." *Id.* at 12.  The Plaintiffs contend that the Court would have "to rewrite that provision to add language exempting from its effect claims arising under controlling state law," which the Court "is not permitted [to do] under Maryland law." *Id.*

Alternatively, the Plaintiffs argue that, under the facts of this case, the Arbitration Clause is "in irreconcilable conflict with the Maryland Clause." Pls.' Mem. 13.  In their view, "the plain language of the Maryland Clause" shows that "the parties understood and intended that claims arising under the [Maryland Franchise Law] were exempt from the arbitration [clause]." *Id.*  The Plaintiffs maintain that "no agreement to arbitrate was ever formed" because the contractual provisions referencing Maryland Franchise Law and the franchisees' rights under that law "supersede the mandatory arbitration clauses specified by Article 27 of the Franchise Agreement, and Article 14 of the Development Agreement," and the Arbitration Clause "cannot be reconciled with [them]." Pls.' Reply & Opp'n 7.

The Plaintiffs insist that, "[b]ecause claims under the [Maryland Franchise Law] are inextricably related to any claim that is based on or arises from the contract, the [Arbitration] Clause must be interpreted as also exempting those contract claims from arbitration when, as in this case, a claim under the [Maryland Franchise Law] is asserted." *Id.* at 14.  Thus, the Plaintiffs contend that, although the claims that Defendants brought in arbitration do not arise under the [Maryland Franchise Law], they are compulsory counterclaims to the Plaintiffs' claims under Fed. R. Civ. P. 13(a)(1) and should be exempt from arbitration because Defendants'  and

the Plaintiffs' claims involve the same question of "whether there is a valid and enforceable contract," and *the Plaintiffs*' claims arise under the Maryland Franchise Law.  *Id.* at 13–14.   The Plaintiffs do not identify any case law, binding or otherwise, in support of their position that the Arbitration Clause is void by operation of law or the Maryland Clause.

Noting that Dickey's filed for arbitration with regard to common law claims, Defendants assert that "Plaintiffs do *not* contend that the Regulation or the Maryland [Clause] in the Franchise Agreement negates *Dickey's* (as opposed to the franchisee's) right to bring an arbitration asserting *breach of contract and other common law claims* (as opposed to claims under the Maryland Franchise Law)."  *Id.* at 2 n.1.  Although it is true that the Plaintiffs do not contend that claims that do not arise under Maryland Franchise Law cannot be brought in arbitration, Defendants' characterization of the Plaintiffs' argument is misleading.  The Plaintiffs contend that there is no arbitration agreement whatsoever, such that Defendants had no right to bring any claim, under Maryland Franchise Law or otherwise, in arbitration. Pls.' Mem. 2.

Defendants also argue that the Maryland Court of Appeals, when interpreting the Maryland Franchise Law in *Holmes v. Coverall North America*, 649 A.2d 365, 368 (Md. 1994), "held that the use of the words 'sue' and 'court' (in the statutory section providing a right to sue for violations of the law) did *not* negate an arbitration provision," Defs.' Mem. 12–13, but rather "generally established only a 'right of action' that could be asserted in court or in an arbitration," *id.* at 15.   In Defendants' view, "Plaintiffs' interpretation of [COMAR 02.02.08.16(L)(3)] as prohibiting arbitrations not only would be inconsistent with the Court of Appeals' decision in *Holmes*, but would contradict the very statutory language (as interpreted by *Holmes*) that the Regulation is intended to implement – and would, therefore, be invalid under Maryland law."  *Id.* at 19.   Defendants contend that "Section 29.2(3) of the Maryland [Clause] recognized that a

franchisee could bring a claim under the Maryland Franchise Law in an 'arbitration and/or litigation.'"  *Id.* at 16.  According to Defendants, "several courts have affirmatively enforced arbitration provisions in franchise agreements governed by Maryland law as to claims for violation of the Maryland Franchise Law."  *Id.*  at 16 (citing *Zaks v. TES Franchising*, No. 3:01CV2266JBA, 2004 WL 1553611 (D. Conn. July 9, 2004); *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415 (8th Cir. 2008)).[10]

With regard to the validity of arbitration clauses in light of the Maryland Franchise Law,[11] *Zaks v. TES Franchising*, No. 3:01CV2266JBA, 2004 WL 1553611 (D. Conn. July 9, 2004), is informative.  There, two franchisees brought suits against TES Franchising and others (collectively, "TES"), stating common law claims and, in the case of Zaks, violations of the Maryland Franchise Law.  *Id.* at *1.  TES "moved to stay the cases and compel arbitration," based on a clause in both plaintiffs' agreements that provided that "'[a]ll disputes and claims

---

[10] In *Coffee Beanery*, the court did not enforce the arbitration provision.  Rather, the Sixth Circuit vacated the arbitrator's award because one of the franchisors had violated the Maryland Franchise Law by failing to disclose a felony conviction, reasoning:

> [T]he purpose of this provision of the Franchise Act is to allow parties to make informed decisions regarding whether to enter into a franchise agreement and with whom they choose to do business. Because WW was deprived of a mandatory, statutorily required notice, prior into entering into the franchise agreement, and did not have an opportunity to avoid being subjected to the consequences of having entered into the contract (including the requirement to arbitrate such claims), WW should not be bound by the arbitration provisions of the agreement which it was fraudulently induced into signing in violation of the Franchise Act.

300 F. App'x at 421.

[11] Although the Plaintiffs insist that "their argument is based on the contractual commitments" and not on an assertion that "the provisions of the Act or the Non-Waiver Rule negate or otherwise render the clauses unenforceable," Pls.' Reply 11, 13, the Franchise Agreement provides that "[a]ny provision of this Agreement which is otherwise prohibited under Maryland Franchise Registration and Disclosure Law or the Maryland Franchise Regulations is void," Franchise Agr. art. 29.2(4), such that the effects of the Maryland Franchise Law and the Maryland Regulations on arbitration agreements are relevant.

relating to this Agreement, the rights and obligations of the parties hereto, or any claims or causes of action relating to the performance of either party, and/or the purchase of franchise goods by Consultant Franchisee [plaintiffs] will be settled by arbitration. . . .'" *Id.* (quoting Zaks Agr. ¶ 20.01)   The plaintiffs opposed the motion, citing "two exceptions to the arbitration requirement," one of which "provide[d] that '[n]otwithstanding the foregoing, the arbitrator will have no jurisdiction over disputes relating to the ownership, validity, or registration of any mark, trade secret or copyright of Franchisor,'" and the other of which provided that the parties "agree[d] to submit any disputes between them to the jurisdiction and venue of a court of competent jurisdiction in the State of Connecticut, New Haven County." *Id.* at *1–2 (quoting Zaks Agr. ¶¶ 20.03 and 22.01(a)).   Additionally, Zaks's agreement stated: "'You may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law,'" and an addendum stated that the agreement "require[d] binding arbitration . . . in Connecticut." *Id.* at *2 & n.1 (quoting Zaks Agr. ¶ 22.01(a) & Add. at CA-33).

Initially, the addendum was not part of the record before the court, and the court denied TES's motion to compel arbitration on the basis that Zaks's franchise agreement was "ambiguous in that Section XX provision required virtually all disputes to be settled by arbitration, and Paragraph 22.01 provides that the parties agreed to submit any disputes between them to a court of competent jurisdiction." *Id.* at *1–2.   Once presented with the addendum,[12] the District of Connecticut granted TES's motion to compel arbitration and to stay Zaks's litigation, concluding that the agreement and addendum together "unambiguously establishe[d] that Zaks' claims are subject to arbitration." *Id.* at *3.   The court stated that ¶ 22.01(a)'s

---

[12] TES appealed the denial and the addendum was part of the record before the Second Circuit. *Id.* at *1.   "[T]he parties agreed to withdraw the appeals pending before the Second Circuit so that [the district court] could decide the arbitration issue with all contested documents in the record." *Id.*

provision for suits in Maryland was "a mere residual venue clause, applied only after the terms of arbitration in [¶ 20.01] are given full effect," and that "[t]he plain language of the Maryland lawsuit provision in Paragraph 22.01(a) . . . is consistent with a residual venue provision." *Id*. at *3–4. The court reasoned:

> [T]he use of the word "lawsuit" is revealing; a reasonable construction of the provision would be that the parties consent to be sued in Maryland (in addition to Connecticut), subject to the arbitration constraints to which they have also agreed. Thus, any claim outside the scope of or among the exceptions to the arbitration provision, or any claim for judicial review subsequent to an arbitration decision, could under the Agreement be brought in Maryland if the claim was based on the Maryland Franchise Registration and Disclosure Law. Plaintiffs' argument is based on the mistaken assumption that the Maryland Franchise Registration and Disclosure Law prohibits arbitration, or is otherwise inconsistent with a contractual agreement between parties to arbitrate most claims arising out of the contract. Plaintiffs cite no authority for its assumption. The Court of Appeals of Maryland, however, has addressed the precise issue of whether claims of violations of the Maryland Franchise Registration and Disclosure Law permit the franchisee to avoid an arbitration agreement in a contract. In *Holmes v. Coverall North America*, 336 Md. 534, 550–51, 649 A.2d 365 (1994), the Maryland Court of Appeals concluded:
>
>> We see nothing inherent in this legislative policy [of the Franchise Registration and Disclosure Law] which is inconsistent with the enforcement of a valid arbitration agreement entered into by the parties to a franchise contract. In fact, § 365B of the Franchise Act states that '[t]he powers, remedies, procedures, and penalties of this subtitle are in addition to and not in limitation of any other powers, remedies, procedures, and penalties provided by law.' Thus, because the Maryland Arbitration Act was in existence prior to the promulgation of the Franchise Act, the language of § 365B of the Franchise Act seems to clearly provide for, rather than eliminate, the ability of the parties to agree to arbitrate disputes arising out of contracts that are subject to the Franchise Act. The fact that the Franchise Act sets forth specific penalties and provides for both civil and criminal liability in no way precludes the right of the parties to a contract to agree to utilize arbitration to [resolve] their disputes. We also find no indication in the legislative history of the Franchise Act that the legislature intended to preclude arbitration of disputes arising under contracts regulated by the Franchise Act.

*Id*. at 550–551, 649 A.2d 365.

*Zaks*, 2004 WL 1553611, at *4 (footnotes omitted).

*Holmes*, 649 A.2d 365, also provides guidance for this Court as it did for the District of Connecticut. In *Holmes*, the Maryland Court of Appeals considered an issue similar to that currently before this Court: "whether allegations of fraudulent inducement and violations of the Franchise Act in a franchise agreement containing a broad arbitration clause are sufficient to permit the franchisee to avoid arbitration of the dispute." *Id.* at 368. Ronald Holmes and Holmestar Corp. (together, "Holmes"), the franchisee, had signed a franchise agreement with Coverall that stated that "'[a]ny claim or controversy arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration, in accordance with the rules then prevailing of the American Arbitration Association.'" *Id.* Holmes sued Coverall for fraud in the inducement, negligent misrepresentation, professional malpractice, and violations of the Maryland Franchise Law.[13] *Id.* at 367. Coverall responded by filing "a petition for arbitration and for a stay of Holmes's action pending arbitration," which the court granted. *Id.*

---

[13] At the time, the Maryland Franchise Law stated:

"A person who has b[]ought or been granted a franchise may sue under this section either at law or in equity to recover the damages sustained by reason thereof. The court may order the franchisor or subfranchisor to rescind any franchise and to make restitution to the person who purchased or was granted a franchise."

*Holmes v. Coverall N. Am., Inc*., 633 A.2d 932, 937–38 (Md. Ct. Spec. App. 1993) (quoting Md. Code Ann. art. 56, § 365 (1988)). It now provides:

(b) The person who buys or is granted a franchise may sue under this section to recover damages sustained by the grant of the franchise.
(c) A court may order the person who sells or grants a franchise to:
(1) rescind the franchise; and
(2) make restitution to the person who buys or is granted a franchise.

Md. Code Ann., Bus. Regs. § 14-227.

On appeal of the stay, the Maryland Court of Appeals noted the "policy favoring enforcement of arbitration agreements [that] is present in both [Maryland's] own and the federal [arbitration] acts," and concluded that "the strong policy of the Franchise Act" need not "take precedence over the policy of the Maryland Arbitration Act," and that "arbitration of the dispute" in the case before the court would not "contravene the aims of the Franchise Act." *Id.* at 368, 371. The court observed that "other jurisdictions, both state and federal, have found no inherent conflict in enforcing a broad arbitration clause in circumstances virtually identical to those in the present case," such as where there are "allegations of violations of the jurisdiction's franchise and consumer regulations." *Id.* at 371. It "look[ed] to the text, history, and purposes of the Franchise Act itself" to "determine if the legislature intended to preclude arbitration as a forum for providing remedies under the Franchise Act." *Id.* at 372. As discussed, the Maryland Court of Appeals concluded that enforcing a valid arbitration agreement was in keeping with the legislative policy behind the Franchise Act. *Id.* at 373. The court upheld the arbitration order, concluding that Holmes had "not met their burden of establishing that the legislature intended to make an exception to the Maryland Arbitration Act for claims arising under the Franchise Act." *Id.*

*Holmes* and *Zak* are distinguishable from the cases before me because the agreements at issue in those cases did not include clauses stating that the agreements would not require the franchisee to waive its right to file a lawsuit, or clauses stating that any provision prohibited by the Maryland Anti-Waiver Regulation was void. Further, neither case discussed the effects of the Maryland Anti-Waiver Regulation on arbitration agreements. Nonetheless, *Holmes* and *Zaks* stand for the proposition that Maryland Franchise Law does not prohibit arbitration and, specifically, that a franchise agreement can require a franchisee to go to arbitration before filing

suit in court.  *See id.* at 373; *Zaks*, 2004 WL 1553611, at *4.  Given the binding precedent of *Holmes*, the persuasive authority of *Zaks*, and the Plaintiffs' failure to identify any authority to the contrary, the Plaintiffs have not established that the Arbitration Clause is voided by the Maryland Franchise Law, which Article 29.2(6) of the Franchise Agreement incorporates into the agreement.

As for the Anti-Waiver Regulation, the language of Md. Regs. 02.02.08.16(L)(1) is consistent with Bus. Regs. § 14-226.  Therefore, it, also, does not prohibit arbitration.  *See Holmes*, 649 A.2d at 373.  Yet, Md. Regs. 02.02.08.16(L)(3), which states that it is a violation of Maryland Franchise Law to "require[] a franchisee to . . . [w]aive the franchisee's right to file a lawsuit alleging a cause of action arising under Maryland Franchise Law in any court of competent jurisdiction in this State," imposes a limit that the statute does not.  Namely, the regulation prohibits a franchisor from requiring a franchisee to waive the right to file a *lawsuit* specifically, whereas the statute only prohibits a franchisor from requiring the franchisee to agree to relieve the franchisor from liability generally.  Thus, the regulation could be read to require that the franchisee be able to pursue court action initially, as opposed to arbitration, while the statute simply permits the franchisee to establish the franchisor's liability, whether through court action or arbitration.

The Maryland Court of Appeals "consistently [has] held that, where the Legislature has delegated such broad authority to a state administrative agency to promulgate regulations in an area, the agency's regulations are valid under the statute if they do not contradict the statutory language or purpose."  *Lussier v. Md. Racing Comm'n*, 684 A.2d 804, 807 (Md. 1996); *see State v. Phillips*, 63 A.3d 51, 74 (Md. Ct. Spec. App. 2013) (quoting *Lussier*); *see also Univ. of Texas Sw. Medical Ctr. v. Nassar*, ---- U.S. ----, 133 S. Ct. 2517 (2013) ("The weight of deference

afforded to agency interpretations . . . depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).  However, "the rulings, interpretations and opinions" of the administrator of an act are "not controlling upon the courts by reason of their authority," although they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore*, 323 U.S. at 140 (considering the "interpretative bulletin and . . . informal rulings" of the administrator of the Fair Labor Standards Act).

Concluding that the Anti-Waiver Regulation prohibits compelled waiver of the right to bring a court action specifically, rather than prohibiting compelled waiver of the broader right to pursue litigation *or* arbitration, would contradict the purpose of the statute, which was to complement rather than supplant existing laws, such as the Maryland Arbitration Act.  *See Holmes*, 649 A.2d at 373.  Further, it would be inconsistent with the statutory language, as interpreted by the Maryland Court of Appeals, *see id.*, and, in "giving deference to the agency's own application," I must "be cognizant of avoiding an illogical, absurd, or inconsistent result." *Western Corr. Inst. v. Geiger*, 747 A.2d 697, 701 (Md. Ct. Spec. App. 2000).  Therefore, I interpret Md. Regs. 02.02.08.16(L)(3) to prohibit the franchisor from requiring the franchisee to waive its right to bring claims against the franchisor, while permitting the franchisee to waive this right voluntarily, to agree to arbitrate, or to agree to pursue arbitration before litigation.  *See Zaks*, 2004 WL 1553611, at *4.  Consequently, Plaintiffs also have not established that the Anti-Waiver Regulation, as incorporated by Article 29.2(6) of the Franchise Agreement, renders the Arbitration Clause void.  But, that does not mean that the Arbitration Clause necessarily is valid,

because the language of the Maryland Clause could trump the language of the Arbitration Clause.

Although the District of Connecticut concluded that the arbitration agreement in *Zaks* was valid, despite the clause permitting the franchisee to "'bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law,'" *see Zaks*, 2004 WL 1553611, at *2 n.1 (quoting Zaks Agr. ¶ 22.01(a)), the contractual terms in *Zaks* are inapposite.  There, rather than stating explicitly that the right to file suit in a Maryland court alleging a cause of action under the Maryland Franchise Law could not be the subject of compelled waiver, *see* Franchise Agr. art. 29.2(4), the agreement simply stated that the franchisee had the right to "bring a lawsuit in Maryland" alleging Maryland Franchise Law claims.  *Zaks*, 2004 WL 1553611, at *2.   Moreover, in *Zaks*, the District of Connecticut emphasized that the addendum, restating the arbitration obligation, "obviate[d] the tension" between the arbitration clause and the "Maryland lawsuit provision" and "clarifie[d]" that the parties agreed to arbitration, such that it eliminated any ambiguity that might have been present otherwise.  2004 WL 1553611, at *3.  Indeed, before it was presented with the addendum, the District of Connecticut concluded that the franchise agreement was ambiguous; it was only with the addendum that the District of Connecticut found the agreement to be unambiguous.  *Id.* at *1–2.

> Here, as noted, the Arbitration Clause provides
>
> the parties agree to submit all disputes, controversies, claims, causes of action and/or alleged breaches or failures to perform arising out of or relating to this Agreement (and attachments) or the relationship created by this Agreement (collectively, "Disputes") to non-binding mediation prior to filing any action in court with respect to the Dispute. The mediation shall be conducted in Collin County, Texas….

> all Disputes which shall not be resolved through mediation in accordance with
> Article 27.1 shall be submitted for binding arbitration to the office of the AAA
> located nearest to Dickey's corporate headquarters in Plano, Collin County,
> Texas, on demand of either party.

Franchise Agr. art. 27.1–27.2; Dev. Agr. art. 14B–D.  Read in isolation, this is unambiguous language that says that the parties will pursue mediation, and then arbitration, in Texas, before filing any court action.  Franchise Agr. art. 27.1–27.2; Dev. Agr. art. 14B–D.  But, a contract must be read as a whole.  *Gold Coast Mall, Inc. v. Larmar Corp.*, 468 A.2d 91, 97 (Md. 1983); *see Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232–33 (Md. 2013)

Thus, for the Franchise Agreements, I must also consider the Maryland Clause, which provides:

> [T]he Laws of various states …may modify certain of your rights and obligations
> hereunder. Accordingly, you acknowledge and agree that the Laws of such states
> (including those, if any, set forth in Article 29.2) (collectively, "Controlling
> Law") shall govern and control any contrary or inconsistent provisions of this
> Agreement (collectively, "Inconsistent Provisions") and such Inconsistent
> Provisions are hereby modified and amended, where applicable, so that any
> Inconsistent Provisions of this Agreement comply with Controlling Law;
> <u>PROVIDED HOWEVER</u>, THIS AGREEMENT SHALL ONLY BE MODIFIED
> AND AMENDED ONLY TO THE EXTENT: (A) SUCH CONTROLLING
> LAW IS BINDING ON THE PARTIES TO THIS AGREEMENT; AND (B)
> SUCH CONTROLLING LAW IS APPLICABLE TO THE MATTERS SET
> FORTH IN THIS AGREEMENT. ...
>
> … Notwithstanding any provisions in this Agreement to the contrary,
> subject to … the []Maryland Franchise Registration and Disclosure Law[] and
> Title 02, Subtitle 02, Chapter 8, Sections 02.02.08.01 – 02.02.08.18 of the Code
> of Maryland Regulations (the "Maryland Franchise Regulations"):
>
> * * *
>
> 4. The provisions of this Agreement shall not require you to waive your
> right to file a lawsuit alleging a cause of action arising under Maryland Franchise
> Law in any court of competent jurisdiction in the State of Maryland.
>
> * * *
>
> 6. Any provision of this Agreement which is otherwise prohibited under
> Maryland Franchise Registration and Disclosure Law or the Maryland Franchise
> Regulations is void.

Franchise Agr. art. 29.  And, for the Development Agreement, I must consider the Arbitration Clause in conjunction with the Acknowledgments Clause and the Maryland Addendum. The Acknowledgments Clause states:

You acknowledge that the laws of various states which may have jurisdiction over you may modify certain of your rights and obligations hereunder, and that attached hereto as Attachment D (and made a part hereof as if set forth verbatim herein) are various state specific modifications of this Agreement which shall apply only if applicable to you and your Restaurant and only if executed by you. Without limiting the generality of the foregoing, *nothing herein shall mitigate or waive your rights or Dickey's liability under the Maryland Franchise Registration and Disclosure Law*.

Dev. Agr. art. 15.D (emphasis added).  The Maryland Addendum provides:

Any acknowledgments or representations of the developer that disclaim the occurrence and/or acknowledge the non-occurrence of acts that would constitute a violation of the Franchise Law are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure law.

Any provision of this Agreement which designates jurisdiction or venue outside of the State of Maryland or requires you to agree to jurisdiction or venue in a forum outside of the State of Maryland is void with respect to any claim arising under the Maryland Franchise Registration and Disclosure Law.

*Id.* Att. D ¶¶ 2, 3.

Here, when the Arbitration Clause is read in conjunction with the Maryland Clause or the Acknowledgments Clause, the language is susceptible to multiple meanings to a reasonably prudent person.  As Defendants see it, the Maryland Clause allows for arbitration in Texas, and the Arbitration Clause controls.[14]  Defs.' Mem. 12–13, 16.  Indeed, under one interpretation, the Arbitration Clause could function in harmony with the Maryland Clause and the Acknowledgments Clause and mean that a franchisee generally has the right to file suit in Maryland and cannot be forced to relinquish that right but, in the Franchise Agreement, the Plaintiffs voluntarily waived that right and are bound by the Arbitration Clause.  With this reading, the Arbitration Clause is valid.  But, in the Plaintiffs' view, the Maryland Clause and the Acknowledgments Clause control, and their language refers to litigation only, not arbitration.

---

[14] Defendants do not address the effects of the Acknowledgments Clause on the Arbitration Clause in the Development Agreement.

Pls.' Mem. 8, 11, 13.   Similarly, under a second interpretation, the Arbitration Clause is boilerplate language that the Maryland Clause and the Acknowledgments Clause trump, such that the Plaintiffs, who otherwise would be bound by the Arbitration Clause, are not bound, by operation of the Maryland Clause or the Acknowledgments Clause.   Read as such, the Arbitration Clause is not valid.   In short, the contract language is ambiguous.   *See Pacific Indem. Co.*, 488 A.2d at 489.   And, unlike in *Zaks*, where an addendum clarified the contractual language, there is no such additional evidence beyond the Arbitration Clause to eliminate the ambiguity.   Notably, both of these interpretations are consistent with the Maryland Franchise Law, as interpreted by the Court of Appeals in *Holmes*, 649 A.2d at 373.[15]   Because the Plaintiffs and Defendants each favor a different interpretation of the ambiguous language, a significant factual dispute exists regarding the intent of the parties with regard to the Arbitration Clause and the interplay between the Arbitration Clause and the Maryland Clause in the Franchise Agreement.   A jury must decide this issue.   *See* 9 U.S.C. § 4; *Rose v. New Day Financial, LLC*, 816 F. Supp. 2d 245, 252 n.5 (D. Md. Sept. 9, 2011) ("[When] the parties dispute the existence of an arbitration agreement, . . . the party alleged to have violated the arbitration agreement is entitled to a jury trial on the existence of an agreement.").[16]

---

[15] Although the *Holmes* Court only discussed art. 56, § 365 (now Bus. Regs. § 14-227), § 365C (now Bus. Regs. § 14-226) also was in effect at the time.   *See* Acts 1992, c. 4, § 2.

[16] Because the Plaintiffs must satisfy each of the four requirement set forth in *Winter* as articulated, the Plaintiffs cannot prevail on their motion unless the jury finds that the parties did not intend for the Arbitration Clause to bar lawsuits in Maryland alleging claims under the Maryland Franchise Law, such that the Plaintiffs are likely to succeed on the merits.   *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009). Therefore, I will not address the other three requirements at this time.   *See id.*   Moreover, even though Defendants argue that the FAA preempts the Anti-Waiver Provision, such that it cannot negate the Arbitration Clause, Defs.' Mem. 20, I need not consider this argument unless the jury finds that the parties did not enter into an arbitration agreement, based on the Anti-Waiver Provision.

With regard to the Development Agreement, however, the language regarding venue is not ambiguous. Defendants contend that the Maryland Addendum "relates only to *venue* and, on its face, could not be read as negating the arbitration clause for either a franchisee's claims under the Franchise Law or Dickey's claims for breach of contract." Defs.' Mem. 8 n.4, 12 n.6. But Defendants do not address why the venue provision of the Maryland Addendum would not govern disputes under the Development Agreement. The Maryland Addendum clearly states that venue is in Maryland, and any provision of the Development Agreement to the contrary is void. Therefore, while the ambiguity in the Development Agreement as to whether Plaintiffs agreed to litigate Maryland Franchise Act claims as opposed to arbitrate them is an issue that must be put before a jury, as discussed above, I find that the unambiguous language of the Development Agreement provides for Maryland as the forum. *See Bd. of Educ. of Charles Cnty. v. Plymouth Rubber Co.*, 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990).

## VII.   CONCLUSION

Neither party has made a sufficient showing for the Court to grant its motion. The ambiguity in the Franchise Agreement and the Development Agreement as to whether the parties intended to arbitrate as opposed to litigate franchise claims arising under the Maryland Franchise Law, and whether the Franchise Agreement requires such claims to be brought in Texas or Maryland, must be resolved through a jury trial. *See Rose v. New Day Fin., LLC*, 816 F. Supp. 2d 245, 252 n.5 (D. Md. Sept. 9, 2011). Counsel are to confer and to propose jointly a pretrial schedule addressing any discovery that must be conducted regarding the narrow issue that will be put before the jury, and then arrange a telephone conference call with me to discuss further scheduling. The Consent Order not to proceed further with arbitration, ECF No. 37, remains in effect until the aforementioned ambiguity of the Arbitration Clause is resolved. The Trouard

Plaintiffs' Motion for a Preliminary Injunction, ECF No. 2 in *Trouard*; the Chorley Plaintiffs'

Motion for Preliminary Injunction, ECF No. 3 in *Chorley*; and Defendants' Cross-Motion to

Compel Arbitration and to Stay These Actions, ECF No. 23, are denied without prejudice to

being resubmitted on request, depending on the outcome of the jury trial to resolve the ambiguity

in the agreements.


Date: <u>August 1, 2014</u>                         <u>      /S/                    </u>
                                                    Paul W. Grimm
                                                    United States District Judge
lyb